This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Clayton Henry, appeals from the decision of the Lorain County Court of Common Pleas, which convicted him of two counts of rape and sentenced him accordingly. This Court affirms.
 I. {¶ 2} On March 20, 2002, appellant was indicted by the Lorain County Grand Jury on two counts of rape, in violation of R.C.2907.02(A)(2). The case proceeded to a jury trial on October 3, 2002, and appellant was found guilty of both rape counts. Appellant was sentenced to five years incarceration for each count, his sentences to be served consecutively, receiving a total of ten years in prison. On October 10, 2002, the court held a sexual predator hearing for appellant and classified him as a sexually oriented offender.
 {¶ 3} Appellant timely appealed his conviction, setting forth five assignments of error for review. This Court will address appellant's assignments of error out of order for ease of discussion.
 II. FOURTH ASSIGNMENT OF ERROR "THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29 OF THE OHIO RULES OF CRIMINAL PROCEDURE."
 FIFTH ASSIGNMENT OF ERROR "APPELLANT'S CONVICTION FOR TWO COUNTS OF RAPE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 4} In his fourth assignment of error, appellant argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal. In his fifth assignment of error, appellant argues that his conviction for two counts of rape was against the manifest weight of the evidence. This Court disagrees.
 {¶ 5} It is well settled that the standard of review for a motion for acquittal under Crim.R. 29(A) and the standard of review for a challenge to the sufficiency of the evidence are the same standard. Statev. Bezak (Feb. 18, 1998), 9th Dist. No. 18533. This Court has held the following:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 6} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, citingThompkins, 78 Ohio St.3d at 390 (Cook, J., concurring).
 {¶ 7} In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
 "[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
 "A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue more than it supports the other. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony.
 "As sufficient evidence is required to reach a jury, a finding that a conviction is supported by the weight of the evidence thus includes a finding of sufficiency. Therefore, `a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.'" (Citations omitted.) State v. Morton, 9th Dist. No. 21047, 2002-Ohio-6458, ¶¶ 26-28.
 {¶ 8} Appellant was convicted of two counts of rape under R.C.2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
 {¶ 9} In this case, the State presented several witnesses who provided testimony concerning the two rapes. Officer Dennis Camarillo testified that he was dispatched to Room 6 of the Lake Motel to respond to a rape complaint. Once he arrived at the scene, he stated that the victim was visibly upset, crying and flushed and distressed to the point that it was difficult for her to speak to him. Officer Camarillo testified that the victim explained what had happened to her as follows:
 "She told me earlier on in the afternoon on the 16th at 2 o'clock she checked into the Lake Motel with a friend that she knew only as Twin. That was later identified as Larry Jackson. She was staying at the Lake Motel she told me because she was homeless.
 "About 5 o'clock, Mr. Wright, Mr. Whitfield and Mr. Henry came over to the hotel room, and they told [the victim] that they could provide her with a place to stay at the apartments across the street in exchange for sexual favors, and if she maintained the apartment, they would let her stay there under those conditions.
 "And a short while later they had left. Then they returned sometime I believe it was between 7 and 8 P.M. They came back to the hotel room.
 "Shortly after they arrived, Twin left to get some food. After he left, [the victim] told me she was laying on the bed and the three males, Whitfield, Henry, and Mr. Wright, surrounded her on the bed. Henry held her legs down, and Whitfield held her by the arms, and Mr. Wright began to disrobe her.
 "She said during the entire time she was pleading with them to please stop, however they didn't. They didn't stop. They continued on.
 "After she was undressed, she said Mr. Wright climbed on top of her and had unprotected vaginal intercourse with her. *** As soon as he had gotten done, Mr. Henry had unprotected vaginal intercourse with her, and after he got done, Mr. Whitfield had intercourse with her."
 {¶ 10} Officer Camarillo stated that the victim told him that the three men later raped her a second time, after which she called the hospital where her mother worked and was able to get a hold of one of her mother's co-workers on the telephone, who in turn called the police for the victim. He further stated that the victim explained to him that when she was on the telephone with her mother's coworker, Mr. Wright threatened her and then the three men left the motel room.
 {¶ 11} Officer Camarillo testified that as he was speaking with the victim, Officer Shawn Petty observed an SUV pull out of the parking lot from the apartments located directly across the street from the motel. Officer Petty advised assisting units of the direction the SUV was traveling. One unit followed the SUV, observed it traveling at a high rate of speed without its headlights, initiated a traffic stop of the vehicle, and relayed that they potentially had the three suspects from the motel room. Officer Camarillo testified that he then transported the victim to the scene of the traffic stop where she identified Mr. Whitfield, Mr. Wright, and appellant as the three males who had raped her.
 {¶ 12} Officer Petty testified that he assisted Officer Camarillo with the rape complaint at Lake Motel and his testimony corroborated Officer Camarillo's testimony. Officer Christopher Kovach testified that he was the third vehicle to arrive on scene at the motel and he proceeded to search the area for the suspects. He stated that he received Officer Petty's message concerning the SUV and his unit followed the vehicle and initiated the traffic stop. Officer Kovach's testimony corroborated the testimony of Officer Camarillo and Officer Petty.
 {¶ 13} The victim also testified at trial. She stated that appellant and the other two men came to the motel room and Larry let them in the room and then he left. She testified that she was not afraid of the three men because she knew them and had been around them many times. Although she knew appellant, she stated that she never had sex with him or the other men in the past. She stated that the three men stayed in the room and watched pornography and smoked pot while she sat on the bed making phone calls to find someone to come pick her up from the motel.
 {¶ 14} The victim testified that Mr. Wright asked her to go into the bathroom with him. When she did, he told her that he had made a deal with Bonita, the woman who had kicked her out earlier that day. She asked him what the deal was and he told her that she could go back and live at Bonita's again if she cleaned the house, did dishes, and did any type of sexual favors that Mr. Wright, Mr. Whitfield, and appellant asked her to do for them and she couldn't say no. The victim told Mr. Wright that there was no way she would do that and she would find somewhere else to stay.
 {¶ 15} The victim stated that she left the bathroom and sat back on the bed in the room. The State asked her to explain to the jury what happened next and she testified as follows:
 "Marcus walked over to the bed. I was sitting in the middle of the bed. *** He sat down. Then he started pulling at my shirt. I told him to stop. I told him to quit. He wasn't paying any attention to me. He just kept pulling at my shirt. I kept pulling back, you know, pulling back at my shirt.
 "Eventually, Desimen came around to my left side and started pulling at my pants. So at this point I had Marcus pulling at my shirt and Desimen pulling at my pants the same time. I'm telling them to stop. I'm explaining to them I did not want to do this; that I wanted my clothes on.
 "*** Clayton was at the end of the bed. Eventually they got my top and pants off. *** I was laying on the bed at this point. I was screaming. I was telling them to stop. *** Clayton eventually came over and sat on the bed, on the end of the bed. *** Desimen got on top of me and started intercourse, against my will. I was saying no. I was telling him to stop. Marcus had hold of my hands above my head ***. Clayton came around behind Desimen and had a hold of my feet, had a hold of my legs, my lower legs.
 "*** I seen — what I seen was Clayton *** hit Desimen with his elbow, like, hey, you know, my turn. Desimen got up and Clayton got on top of me and started intercourse. ***Marcus had hold of my hands the whole time. *** Clayton was on top of me and *** Desimen had hold of my legs. And then Clayton got up. Clayton came around and grabbed my arm. Well, before he did that, I bit the back of Marcus's arm *** because he had my arms ***. I don't know if it left any marks or not, but I know I did bite him.
 "*** Clayton came around and grabbed my arms. Marcus came around the bed and started intercourse. *** At that point, all three of them had *** taken their turn *** and got up and left me on the bed. I curled up on the bed, and I was just crying. I didn't know what else to do at that point. I was just balling my eyes out."
 {¶ 16} The victim stated that the three men then went into the bathroom to clean up. As soon as they finished, she grabbed all of her clothes and ran into the bathroom. She testified that Mr. Wright then came into the bathroom, grabbed her head and pushed her down from behind, an attempted to force anal sex upon her. She screamed at him and he let go and left the bathroom.
 {¶ 17} The victim further testified that the three men left the motel room and she began calling people but she was unable to reach anyone. She testified that the weather was terribly cold outside, it was snowing, she had no winter coat and all of her clothing was still at Bonita's house. She also stated that one of her friends had told her that he would come pick her up earlier that day and she began paging him again after the rape to come get her.
 {¶ 18} The victim then testified that, to her dismay, the three men returned to the motel room. She stated that the men proceeded to rape her again. She provided the following testimony about the second rape:
 "Eventually, what happened was basically the same thing all over again. But this time, I felt that there was really nothing that I could do. I was totally helpless at this point. That's the way that I felt.
 "They came over to the bed at one time this time and started taking my clothes off. I just, I just didn't know what to do. I just started crying. I just started crying uncontrollably.
 "I said no. I told them to stop. There was just really nothing — I mean, I fought. I told them to stop. I tried to pull my clothes back on and everything like that, but I just didn't know what to do. *** I was afraid.
 "*** The same thing happened the first time. I still had my bra and my underwear on the whole time, except for this time they had me on my hands and my knees instead of laying down on my back.
 "Prior to it happening, I remember Desimen saying to me, if I don't do it first, nobody will do it. Nobody will do it."
 {¶ 19} After the second rape, the victim testified that the three men got up off the bed and left her curled up and crying. She stated that she started making phone calls again and finally reached one of her mom's coworkers at the hospital. The woman heard how upset she was and started asking her what happened. The victim was afraid to tell her she had been raped with the three men still in the room and, once the woman sensed her fear, she asked her if she was raped and she answered "yes" over the phone. She stated that the men must have caught on to her conversation because Mr. Wright walked over to her, pointed at her and said "If you tell anybody, I'll hurt you." She testified that the men then ran out the door and the police arrived shortly thereafter.
 {¶ 20} The State also presented the testimony of Detective Edward Bermudez, who was assigned the case the morning following the reported rapes. Detective Bermudez testified that the first person that he interviewed was Marcus Whitfield and that they met before Detective Bermudez spoke to or had any contact with the victim. He stated that Mr. Whitfield did not initially open up about the incidents, but did eventually admit to what happened with the victim. Detective Bermudez testified that Mr. Whitfield freely told him the following information:
 "He eventually opened up to the fact that they did have sex with her. He made some remarks, to wit, all three of them engaged in sex with her; that she was initially hesitant to wanting Desimen Wright's advances towards her, albeit kissing her chest and rubbing on her. The terms he used was trying to get her hot or get her in the mood, I believe it was.
 "At that time, I continued to interview him regarding the matter. He went on to explain that not only in the first instance was she telling them no, she did not want to continue on with the sexual act and that she was crying loudly, but that during a following incident a few hours later, that she told them that she did not want to have sex with them[.]"
 {¶ 21} Detective Bermudez stated that the entire interview with Mr. Whitfield was tape recorded and the State admitted the tape into evidence at trial. Detective Bermudez also testified that he obtained the phone logs from the motel room for January 16th through January 17th. The logs revealed that, between 2 p.m. on January 16th through the early morning hours of January 17th, approximately 23 calls were made to the pager of the victim's friend Germell Wilson, 3 calls were made to the phone number of the victim's mother, and 3 calls were made to the phone number of the victim's grandparents. This testimony provided independent corroborating evidence that appellant was trying to call people to come get her so she could leave the motel room.
 {¶ 22} In addition to all of the above witnesses, the State presented Mr. Whitfield, appellant's co-defendant, as a hostile witness. The prosecutor questioned him about the tape recorded statements he made about the victim and about his nonconsensual description of the sex between all three men and the victim. During the State's redirect examination of Mr. Whitfield, he responded to the prosecutor's questions as follows:
 "Q. The fact that some people think she should have immediately called the police or should have ran doesn't mean she wasn't raped, does it?
"A. No.
 "Q. Now, just so this Jury is real clear about this, you were charged with rape, correct?
"A. Yeah.
"Q. On the day, within 24 hours of the incident, right?
"A. Yeah.
"Q. And you spoke to Detective Bermudez, didn't you?
"A. Yes.
"Q. And you told him what happened, correct?
"A. Yeah.
 "Q. Now, that was before you ever went in front of Lorain Municipal Court, right?
"A. Yeah.
"Q. And then you had Mr. Wightman. You hired Mr. Wightman, correct?
"A. Yeah.
 "Q. Who was your counsel. And the first time you met with me regarding this case was several months after you had already told the Detective what happened, correct?
"A. Yes.
 "Q. All right. And I did not offer you something in regard to your testimony, correct?
"A. Right.
"***
"Q. In my office, I didn't ask you what happened, did I?
"A. No.
 "Q. I said, `Mr. Whitfield, I'm going to push play,' and I pushed play. Right?
"A. Yeah.
"Q. And we sat there and we listened to that [tape], right?
"A. Yeah.
"***
 "Q. And we listened to that tape, and when I pushed stop, when it was done, I said, `Marcus, is that what happened,' didn't I?
"A. Yeah.
"Q. And what did you tell me?
"A. Yes.
 "Q. And I asked you specifically when you were talking to the cops, were you being truthful, right?
"A. Yeah.
"***
 "Q. Now, once again, when we're talking about force, you spoke to [appellant's defense counsel], and you said nobody was holding her down or forcing her.
 You told Detective Bermudez that she was pushing Desimen back, right?
"A. Yeah.
"Q. And Clayton back, right?
"A. Yeah.
"Q. Saying, `Ouch'?
"A. Yeah.
"***
 "Q. Do you remember `Des' saying, `Hey, it's cool, be quiet, it's cool, be quiet.'
"A. Yeah.
"Q. Do you remember saying that she was crying loud tears?
"A. Yeah.
 "Q. And again, do you remember saying it wasn't like we kind of killed her, like beat her up, kind of rape?
"A. Yeah."
 {¶ 23} After extensive review of the record, this Court finds that appellant's rape convictions conviction were clearly supported by the weight of the evidence. Given the above facts, this Court cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that appellant's convictions for rape must be reversed and a new trial ordered. Appellant's fourth and fifth assignments of error are overruled.
 FIRST ASSIGNMENT OF ERROR "THE TRIAL COURT COMMITTED PLAIN ERROR IN FAILING TO CORRECT PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT."
 {¶ 24} In his first assignment of error, appellant argues that the trial court committed plain error in failing to correct prosecutorial misconduct during closing argument. This Court disagrees.
 {¶ 25} Appellant claims that the prosecutor made derogatory remarks about appellant's defense counsel during closing arguments which created prejudice to appellant. Specifically, he refers to the prosecutor's statements that appellant's defense counsel kept bringing up Larry Jackson's involvement in the case, despite the judge telling him not to do so because Mr. Jackson's case was separate from the other defendants. The prosecutor then described such conduct as cheap, low, and wrong.
 {¶ 26} As a preliminary matter, this Court notes that appellant failed to object on the record when the prosecutor made the allegedly disparaging statements. Failure to raise an issue at the trial court level usually precludes this Court from reviewing the issue. State v.Maurer (1984), 15 Ohio St.3d 239, 260. However, appellant has asserted that this Court should employ the plain error standard of review.
 {¶ 27} The appropriate analysis used to determine whether plain error occurred with regard to prosecutorial conduct has been explained by this Court:
 "Plain error is defined as `error but for the occurrence of which it can be said that the outcome of the trial would have clearly been otherwise.' The Ohio Supreme Court has recognized that the plain- error doctrine should be applied sparingly, and only when necessary to prevent a clear miscarriage of justice. `To exercise [the plain- error doctrine] freely would undermine and impair the administration of justice and detract from the advantages derived from orderly rules of procedure.' Thus, this Court should take notice of plain error `to correct only egregious errors — those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings.'
 "In conducting a plain-error analysis, this Court must employ a three-prong analysis: (1) determine if there is an error, i.e., a deviation from a legal rule; (2) if there is an error, determine if the error is plain, which means that it `must be an "obvious" defect in the trial proceedings'; and (3) determine whether the error has affected substantial rights, which means that `the trial court's error must have affected the outcome of the trial.'" (Citations omitted.) State v. Armstrong, 9th Dist. Nos. 02CA008088, 02CA008089, 2003-Ohio-2154, at ¶¶ 44-45.
 {¶ 28} Accordingly, this Court must first determine whether the prosecutor deviated from a legal rule in making specific statements about appellant's defense counsel during closing argument. It is well settled that prosecutorial conduct during closing arguments is measured by the following:
 "whether the prosecutor's remarks constitute misconduct and, if so whether they prejudiced a substantial right of the defendant. Comments made in closing argument are not viewed in isolation, rather the closing argument is reviewed in its entirety to determine whether remarks by the prosecutor were prejudicial." (Citations omitted.) State v. Smith (Jan. 17, 2001), 9th Dist. No. 99CA007451.
 {¶ 29} After careful review of the prosecutorial statements appellant challenges, this Court cannot find that the statements were improper or that they prejudiced appellant. Subsequently, appellant's substantial rights were not affected by the statements. The prosecutor's remarks concerning the jury instructions and the fact that the jury was not to consider any references made by appellant's defense counsel concerning Larry Jackson did not constitute misconduct that the trial court would need to instruct the jury to disregard. Moreover, the statements were certainly not error that "but for the occurrence of which" it can be said that the outcome of the trial would have clearly been otherwise. Therefore, the trial court did not commit plain error in appellant's case. Appellant's first assignment of error is overruled.
 SECOND ASSIGNMENT OF ERROR "THE TRIAL COURT ERRED BY DENYING APPELLANT THE OPPORTUNITY TO CROSS EXAMINE HOLLY WELLS CONCERNING A MENTAL DEFECT AND ITS EFFECT UPON HER CREDIBILITY AND ABILITY TO RECALL THE INCIDENTS CONTRARY TO THE REQUIREMENTS OF RULE 616(B) OF THE OHIO RULES OF EVIDENCE."
 {¶ 30} In his second assignment of error, appellant argues that the trial court erred by denying him the opportunity to cross examine Sara Griffith, the sexual assault nurse examiner who examined the victim, concerning any possible mental defect of the victim and its effect upon her credibility. Specifically, appellant claims that his attorney should have been allowed to question Ms. Griffith about the victim being diagnosed as bipolar and on medication, and whether she failed to take her medication at the time of the incidents.
 {¶ 31} In this case, the trial court granted the State's motion in limine requesting that defense counsel be prohibited from bringing up, during trial, anything about the victim being bipolar or that she had previously taken anti-depressants. Immediately prior to calling Sara Griffith to the witness stand, the attorneys met with the judge outside the hearing of the jury. The prosecutor reminded the court that the motion was granted, defense counsel objected to the ruling, and the court overruled their objections and restated that the motion was granted to the State.
 {¶ 32} This Court has explained the procedural significance of this type of motion as follows:
 "`A motion in limine is a request for a preliminary order regarding the admissibility of evidence that a party believes may be improper or irrelevant. The purpose of a motion in limine is to alert the court and counsel of the nature of the evidence in order to remove discussion of the evidence from the presence of the jury until the appropriate time during trial when the court makes a ruling on its admissibility.'" (Citations omitted.) State v. Keenan, 9th Dist. No. 20528, 2002-Ohio-754, at ¶ 11, quoting Nurse Griffin Ins. Agency, Inc. v. Erie Ins. Group, 9th Dist. No. 20460, 2001-Ohio-1725.
 {¶ 33} Once appellant's counsel had an opportunity to cross-examine Sara Griffith, he did not attempt to ask her any questions concerning a possible mental defect of the victim or its relevancy to her credibility. Therefore, appellant's attorney failed to preserve the error for appeal by trying to question Ms. Griffith on the subject matter. Since appellant's attorney did not seek the introduction of the evidence at trial, this Court need not review his claim of error on appeal. Appellant's second assignment of error is overruled.
 THIRD ASSIGNMENT OF ERROR "THE TRIAL COURT ERRED BY DENYING APPELLANT'S COUNSEL THE OPPORTUNITY TO CROSS-EXAMINE MARCUS WHITFIELD CONCERNING ANY PERSONAL KNOWLEDGE HE HAD OF APPELLANT'S PAST SEXUAL ACTIVITY WITH THE VICTIM HOLLY WELLS CONTRARY TO OHIO REVISED CODE 2907.02(D)."
 {¶ 34} In his third assignment of error, appellant argues that the trial court erred by denying his counsel the opportunity to cross-examine Mr. Whitfield as to his knowledge of whether appellant had any prior sexual activity with the victim.
 {¶ 35} Under R.C. 2907.02(D), a defendant is entitled to present opinion evidence of a victim's past sexual activity with the defendant to the extent the court finds such evidence is material to a fact at issue in the case and its probative value is not outweighed by its inflammatory or prejudicial nature. In this case, however, any error in denying appellant the opportunity to present such evidence was harmless in light of the overwhelming evidence of appellant's guilt presented during trial. See State v. Griffin (Mar. 5, 1986), 9th Dist. No. 12231. The victim testified that she told appellant no many times throughout the rapes while she cried and tried to push him off of her. Both the officers' and the detective's testimonies corroborated the evidence that the victim was visually upset and crying when the police arrived at the scene, that she did not consent to sex with appellant at any time, and that she made more than 25 phone calls from the motel room in an attempt to find someone to come get her so she could leave the motel for somewhere safe. Even the hostile testimony of Mr. Whitfield corroborated the State's evidence that the victim never consented to sex with appellant, but was instead raped twice by him. Appellant's third assignment of error is overruled.
 III. {¶ 36} Accordingly, appellant's five assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.
SLABY, P.J. and BAIRD, J. CONCUR.